# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ORGILL/SINGER & ASSOCIATES, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> FEDERAL INSURANCE CO., ) <br> ) <br> Defendant. ) <br> ) | 2:12-CV-00113-RCJ-CWH <br><br> **ORDER** |

This case arises out of an insurer's refusal to pay benefits under an executive protection policy. Before the Court is Defendant's Motion for Summary Judgment (ECF No. 30). For the reasons given herein, the Court denies the motion.

## I.   FACTS AND PROCEDURAL HISTORY

Plaintiff Orgill/Singer & Associates, Inc. ("Orgill") used non-party Lakes Payroll, Inc. ("Lakes") to process its payroll from 2001 until 2011. (First Am. Compl. ¶¶ 2, 11, Aug. 28, 2012, ECF No. 19-1). From 2009 to 2011, non-party Deborah DiFrancesco (the sole proprietor, officer, and director of Lakes) perpetrated a fraudulent scheme to embezzle Orgill's Money by forging and altering Electronic Federal Tax Payment System ("EFTPS") transfers to the IRS, i.e., by altering computer-generated EFTPS transfers to reduce or eliminate the actual payments to the IRS and embezzling the difference from Orgill. (*Id.* ¶¶ 12–14). DiFrancesco embezzled over $650,000 in this manner, and Lakes reimbursed Orgill for only $200,000, resulting in a loss to Orgill of over $450,000. (*Id.* ¶ 15).

Orgill was insured under a $1 million Executive Protection Policy No. 8185-5233 (the

"Policy") with Defendant Federal Insurance Co. ("Federal") from May 20, 2011 to May 20, 2012. (*Id.* ¶¶ 1, 16, 35). The fourth of five insuring agreements in the Policy states:

> [Federal] shall be liable for direct losses caused by forgery or alteration of, on or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a certain amount of money, made or drawn by, or drawn upon [Orgill], or made or drawn by one acting as agent of [Orgill], or purporting to have been made or drawn as set forth above . . . .

(*Id.* ¶ 17). The Policy contains eleven general exclusions applying to each of the five insuring agreements. (*Id.* ¶ 19). Orgill argues that none of the general exclusions apply to its claim based upon Lakes's embezzlement. (*See id.*). The two additional exclusions applicable to the fourth insuring agreement for "Depositor's Forgery" are as follows:

> (A) Any instrument, if such forgery or alteration is committed by any: Employee or by any person in collusion with any Employee; or
>
> (B) Any registered or coupon obligations issued or purported to have been issued by [Orgill] or any coupons attached thereto or detached therefrom.

(*Id.*). Contrary to the exclusions in the Policy applicable to each of the other four insuring agreements therein, the exclusions to the Depositor's Forgery insuring agreement do not apply to acts by Orgill's "authorized representative." (*Id.* ¶ 20). Rather, the Depositor's Forgery insuring agreement specifically covers acts by those acting or purporting to act as Orgill's agent. (*Id.*).

Orgill tendered its demand to Federal based upon the Lakes embezzlement on August 9, 2011. (*Id.* ¶ 22). Federal "denied coverage" in a September 16, 2011 letter because the loss did not involve an employee. (*Id.* ¶ 23). However, Federal accepted Lakes's own claim under Lakes's own similar policy with Federal based upon the $200,000 Lakes reimbursed to Orgill, (*see id.* ¶ 15), to ameliorate the losses DiFrancesco had caused to Orgill, (*see id.* ¶ 32).

The last few paragraphs of the First Amended Complaint ("FAC") present a complex theory of bad faith. (*See id.* ¶¶ 29–37). Orgill appears to argue that Federal is guilty of bad faith with respect to Orgill, because Federal denied Orgill's claims under the Policy while at the same time honoring Lakes's claim under its own policy based upon DiFrancesco's embezzlement of

1  Orgill's money on behalf of Lakes, which Federal knew was a sole proprietorship of DiFrancesco
2  herself. (*See id.*).

3  Orgill sued Federal in this Court.  The FAC lists two causes of action: (1) breach of
4  contract; and (2) insurance bad faith.  Defendant has moved for summary judgment.

5  **II.     LEGAL STANDARDS**

6  A court must grant summary judgment when "the movant shows that there is no genuine
7  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
8  Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*
9  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there
10 is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A
11 principal purpose of summary judgment is "to isolate and dispose of factually unsupported
12 claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary
13 judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at
> trial, it must come forward with evidence which would entitle it to a directed verdict
> if the evidence went uncontroverted at trial.  In such a case, the moving party has the
> initial burden of establishing the absence of a genuine issue of fact on each issue
> material to its case.

17 *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations
18 and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden
19 of proving the claim or defense, the moving party can meet its burden in two ways: (1) by
20 presenting evidence to negate an essential element of the nonmoving party's case; or (2) by
21 demonstrating that the nonmoving party failed to make a showing sufficient to establish an
22 element essential to that party's case on which that party will bear the burden of proof at trial. *See*
23 *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary
24 judgment must be denied and the court need not consider the nonmoving party's evidence. *See*
25 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

1  If the moving party meets its initial burden, the burden then shifts to the opposing party to
2  establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
3  475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party
4  need not establish a material issue of fact conclusively in its favor. It is sufficient that "the
5  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
6  versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d
7  626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment
8  by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d
9  1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and
10 allegations of the pleadings and set forth specific facts by producing competent evidence that
11 shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

12 At the summary judgment stage, a court's function is not to weigh the evidence and
13 determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477
14 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are
15 to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely
16 colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

17 **III.   ANALYSIS**

18 Federal argues that there was no breach of contract because there simply was no "forgery
19 or alteration" to any written instrument covered by the Policy. Rather, Federal argues, there was
20 an embezzlement by an agent to whom Orgill had entrusted funds. Federal argues that Lakes had
21 access to its clients' bank accounts, and that whenever payroll taxes were due to the IRS, Lakes
22 would "sweep" the appropriate amount out of its clients' bank accounts (such as Orgill's) by
23 transferring the amounts to Lakes's own separate accounts, and then, a few days later, forwarding
24 the amounts to the IRS on behalf of Lakes's various clients using EFTPS. Lakes's
25 embezzlement scheme simply involved "sweeping" the amounts actually owed to the IRS by

Lakes's clients, but transferring a lesser amount to the IRS and keeping the remainder in Lakes's own account.  To conceal the scheme from its clients and the IRS, Lakes provided its clients with IRS Forms 941 reflecting the amounts it had swept from their accounts and sent the IRS different Forms 941 reflecting the amounts it actually sent to the IRS, forestalling an IRS investigation because the IRS would have to discover that payroll taxes were being under-reported instead of simply noticing that they were being underpaid according to the amounts reported on the Forms 941.

Federal argues that the Policy's first insuring agreement for "Employee Theft" does not apply, because it applies only to acts "by any Employee," and Orgill does not allege that DiFrancesco or Lakes were its employees.  Federal argues that Orgill is therefore inappropriately attempting to fit the facts of the case to the fourth insuring agreement for "Depositor's Forgery."

The question for the Court is a pure question of contract interpretation: does the fourth insuring agreement for "Depositor's Forgery" cover Lakes's activity?  The examples of "forgery or alteration" given under the fourth insuring agreement are for checks to fictitious payees; face-to-face impersonation; and payroll checks, drafts, or orders payable to bearer and a named payee and endorsed by a person other than the named payee without the payee's authority.  The Court is not convinced that no "forgery" or "alteration" occurred.

The terms "forgery" and "alteration" are not defined in the Policy, and those terms appear in plain, lowercase text in the fourth insuring agreement. (*See* Policy 2, 10–12, May 17, 2011, ECF No. 35-1, at 18, 26–28).  The insuring agreements are found on pages 2–3 of the Policy and appear as the parties have quoted them. (*See id.* 2–3, ECF 35-1, at 18–19).  The terms "forgery" and "alteration" must therefore be given their common meanings.  "Forgery" means "fraudulently making a false document or altering a real one to be used as if genuine." *Black's Law Dictionary* 722 (9th ed. 2009).  "Alteration" means "[a]n act done to an instrument, after its execution, whereby its meaning or language os changed; esp., the changing of a term in a

negotiable instrument without the consent of all parties to it." *Id.* 90.  The Court accepts *Black's* definitions as accurately reflecting the intent of the parties and finds that there is a genuine issue of material fact whether the Policy covers the embezzlement here under as "forgery" or "alteration."

Orgill focuses on the "alteration" theory, arguing that because Lakes's computer software automatically generated EFTPS transfers to be made from Lakes to the IRS, and because Lakes transferred less to the IRS than it should have according to those automatically generated transfers, that Lakes "altered" instruments under the meaning of the Policy.  Orgill argues that the two-step nature of the embezzlement scheme should not matter.  The Court agrees.  Normally, alteration involves a tortfeasor altering a check to increase the amount to be paid (to himself).  It is an interesting question whether an alteration theory can lie under the present circumstances, where: (1) the alleged alteration did not occur with respect to the transfer between the victim and the tortfeasor but rather between the tortfeasor and a third party whom the tortfeasor has promised to pay on behalf of the victim; and (2) the tortfeasor has not fraudulently increased the amount to be paid by the victim but rather has taken from the victim exactly the amount the victim intended to pay.  The Court finds that an alteration theory can lie here.  The essence of alteration is the theft of the victim's money through manipulation of an instrument through which the victim was to pay money.  The two-step process used here does not obviate an alteration claim.  The Policy must be resolved to the benefit of the insured where ambiguous, and the intent of the Policy was to protect the insured from losses of its money due to various forms of theft by its employees or agents.  Lakes made authorized withdrawals from Orgill to itself and then made under-payments to the IRS.  It can be fairly argued under the Policy that the reduced payments to the IRS after receiving full payments from Plaintiff constituted alterations.

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 30) is DENIED.

IT IS SO ORDERED.

Dated this 6th day of May, 2013.

                                        ROBERT S. JONES
                                        United States District Judge